IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division



| | |
|---|---|
| UNITED STATES OF AMERICA | ) **UNDER SEAL** |
| | ) Criminal No. 3:23-cr-130 |
| | ) |
| v. | ) 18 U.S.C. § 1349 |
| | ) Conspiracy to Commit Health Care Fraud |
| | ) (Count 1) |
| EUGENE THEODORE THOMAS, JR., | ) |
| (Counts 1-28) | ) 18 U.S.C. §§ 1347 & 2 |
| | ) Health Care Fraud |
| BRADY ANDREW BUFFINGTON, | ) (Counts 2-9) |
| (Counts 1, 8, 9, 27 & 28) | ) |
| | ) 18 U.S.C. §§ 1035 & 2 |
| SHELIA SIMMS THOMAS, | ) False Statements Relating to Health Care |
| (Counts 1, 5, 6 & 10-15) | ) Matters |
| | ) (Counts 10-15) |
| Defendants. | ) |
| | ) 42 U.S.C. § 408(a)(5) |
| | ) Conversion of Social Security Funds by |
| | ) Representative Payee |
| | ) (Count 16) |
| | ) |
| | ) 18 U.S.C. § 1001(a)(2) |
| | ) False Material Statements |
| | ) (Counts 17-21) |
| | ) |
| | ) 18 U.S.C. §§ 1343 & 2 |
| | ) Wire Fraud |
| | ) (Counts 22-24) |
| | ) |
| | ) 18 U.S.C. §§ 1512 & 2 |
| | ) Obstruction of Official Proceeding |
| | ) (Counts 25, 26 & 28) |
| | ) |
| | ) 18 U.S.C. §§ 1512(k) |
| | ) Conspiracy to Obstruct Official Proceeding |
| | ) (Count 27) |
| | ) |
| | ) Criminal Forfeiture Allegation |
| | ) 18 U.S.C. §§ 981 & 982 |

## INDICTMENT

October 2023 Term—at Richmond, Virginia

THE GRAND JURY CHARGES THAT:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

### The Virginia Medicaid Program

1.      The Medicaid program was established by Title 19, Social Security Act of 1965, to provide medical assistance to indigent persons. The United States Department of Health and Human Services (HHS) and the Commonwealth of Virginia, Department of Medical Assistance Services (DMAS), administer and supervise the administration of the Medicaid program in Virginia, which is called the Virginia Medical Assistance Program (VMAP).   The United States contributes approximately fifty percent of the cost to the Medicaid program.

2.      VMAP reimburses entities that run residential group homes, provide day support, and provide supported employment for adults with developmental disabilities that render them unable to work and live without assistance (hereafter, "clients"). Title 12, Virginia Administrative Code (VAC), Chapter 122 sets standards for provision of these services and payment for the same.

3.      12 VAC § 30-122-390 governs residential group homes, which provide "skill-building, routine supports, general supports, and safety supports that are provided to enable an individual to acquire, retain, or improve skills necessary to successfully live in the community." 12 VAC § 30-122-390 A.

2

4.      12 VAC § 30-122-380 governs group day service and provides that such services are "provided to help the individual acquire, retain, or improve skills of self-help, socialization, community integration, career planning, and adaptation via opportunities for peer interactions, community integration, and enhancement of social networks. This service typically shall be offered in a nonresidential setting." 12 VAC § 30-122-380 A.

5.      12 VAC § 30-122-400 governs the provision of and payment for group and individual supported employment services. This service "consist[s] of ongoing supports provided by a job coach that enable individuals to be employed in an integrated work setting and may include assisting the individual, either as a sole individual or in small groups, to locate a job or develop a job on behalf of the individual, as well as activities needed by the individual to sustain paid work." 12 VAC § 30-122-400 A.

6.      The Virginia Departments of Behavioral Health and Developmental Services (DBHDS) and Aging and Rehabilitative Services (DARS) were responsible for setting standards of service and care for providers.

7.      All VMAP billing for group home, day support, and supported employment was governed by individual billing rates set forth in the DMAS participation agreement, provider agreements, and rate schedules issued by DMAS, DARS, or DBHDS. Payment for services rendered was conditioned on the services meeting the standards set forth in the Virginia Administrative Code, and those set forth by DARS and DBHDS. Group home, day support, and supported employment providers were permitted only to bill for services that were actually delivered, and which met these standards.

3

8.      Furthermore, DARS required that billing for supported employment was predicated on supported clients being paid for all time spent in supported employment activities, including work and training.

9.      VMAP's allowable provider reimbursement rate for supported employment was dependent on the size of the group of clients being supervised by a staff member:

  a.   1 staff member per 2 or less clients: $19.25 per hour.

  b.   1 staff member per 3-4 clients: $13.52 per hour.

  c.   1 staff member per greater than 4 clients: $11.21 per hour.

**Defendants and Related Entities**

10.     Defendant EUGENE THEODORE THOMAS, JR. (EUGENE THOMAS, JR. or E. THOMAS, JR.) was the owner and Executive Director of Greater Unity Adult Services (GUAS), a company that owns and operates group homes and day support facilities for a clientele consisting of mentally disabled adults and billed VMAP for those services.

11.     EUGENE THOMAS, JR. was also the owner and Executive Director of Greater Unity Adult Employment Services (GUES), a company that provided supported employment services for a clientele consisting of mentally disabled adults and billed VMAP for those services.

12.     Defendant BRADY ANDREW BUFFINGTON was employed by GUAS in various managerial roles, including Day Support Program Director.

13.     Defendant SHELIA SIMMS THOMAS (SHELIA THOMAS or S. THOMAS) is EUGENE THOMAS, JR.'s mother and was employed by GUAS in various roles, including Residential Director.

4

14.     Employee 1 was employed by GUAS in various capacities, including Residential Manager.

15.     GUAS and GUES engaged the services of Electronic Record Company 1 (ERC 1), a business that provided cloud-based digital record-keeping services for the creation and maintenance of client records that VMAP, DARS, and DBHDS required GUAS and GUES to keep; those records included patient notes for GUAS and GUES. GUAS and GUES staff members entered notes regarding client progress using the ERC 1 record-keeping system. As a supervisor, SHELIA THOMAS was able to edit those notes.

16.     GUAS and GUES also engaged the services of Accounting Firm 1. Accountant 1, an employee of Accounting Firm 1, regularly performed accounting services for GUAS.

### Grand Jury Investigations

17.     Between March 2020 and May 2023, grand juries were investigating EUGENE THOMAS, JR. and others with respect to allegations that EUGENE THOMAS, JR. and others had committed various federal crimes, including those charged in Counts 1-21 of this Indictment.

18.     EUGENE THOMAS, JR. became aware of the investigation and was represented by Law Firm A and Attorney A, a partner with Law Firm A, during the investigation.

19.     Various employees of GUAS (including Employee 1) and GUES who were interviewed by federal law enforcement agents or appeared before grand juries investigating the allegations were represented by Attorney B, a partner in Law Firm B.

### COUNT ONE
(Conspiracy to Commit Health Care Fraud)

20.     The Grand Jury realleges and incorporates by reference paragraphs 1-19 of this Indictment as if fully set forth here.

5

21.     Beginning before at least October 2016 and continuing through at least May 2022,

the exact dates being unknown to the Grand Jury, in the Eastern District of Virginia and within

the jurisdiction of this Court, as well as elsewhere, defendants EUGENE THEODORE

THOMAS, JR., BRADY ANDREW BUFFINGTON, and SHELIA SIMMS THOMAS

unlawfully and knowingly conspired with each other, and with others known to the Grand Jury,

to commit an offense contained within Chapter 63 of Title 18 of the United States Code, that is:

to knowingly and unlawfully execute and attempt to execute a scheme and artifice to defraud and

to obtain by false and fraudulent pretenses, representations, and promises, money under the

custody and control of VMAP, a health care benefit program as defined by Title 18, United

States Code, Section 24(b), in connection with the delivery of and payment for health care

benefits, items, and services in violation of Title 18, United States Code, Section 1347.

    (In violation of Title 18, United States Code, Section 1349.)

### COUNTS TWO THROUGH NINE
(Health Care Fraud)

22.     The Grand Jury realleges and incorporates by reference paragraphs 1-19 of this

Indictment as if fully set forth here.

23.     Beginning before at least October 2016, and continuing through on or about at

least May 2022, the exact dates being unknown to the Grand Jury, in the Eastern District of

Virginia, and within the jurisdiction of the Court, EUGENE THEODORE THOMAS, JR.,

BRADY ANDREW BUFFINGTON, and SHELIA SIMMS THOMAS, aided, abetted, induced,

counseled, and encouraged by each other, and by others known to the Grand Jury, did

unlawfully, knowingly, and with intent to defraud, execute and attempt to execute a scheme and

artifice to defraud and to obtain by false and fraudulent pretenses, representations, and promises,

6

money under the custody and control of VMAP, a health care benefit program as defined by Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services.

## Purpose of the Scheme and Artifice to Defraud

24.     The purpose of the scheme and artifice was for defendant EUGENE THOMAS, JR. to gain compensation from VMAP to which he was not entitled, and for his co-conspirators, including BUFFINGTON and SHELIA THOMAS, to continue to be employed and receive compensation from GUAS and GUES, by submitting or causing the submission of claims for payment to VMAP for:

      a.     day support and supported employment services that were not rendered, either because clients were not present at the facilities to receive services or because GUAS or GUES did not provide the services to clients when the clients were present at the facilities;

      b.     supported employment services that were billed at the rate for 1 staff member supervising 2 or less clients, when in fact the group supervised consisted of 1 staff member supervising more than 4 employees; and

      c.     supported employment services that either were not covered or for which clients were not paid for time working or otherwise spent in those services.

## Manner and Means of the Scheme and Artifice to Defraud

25.     The manner and means of the scheme to defraud included, but were not limited to the following:

7

      a.     EUGENE THOMAS, JR. and BUFFINGTON regularly and systematically submitted and caused the submission of bills to DMAS that were fraudulent for the reasons set forth in paragraphs 24 (a)-(c).

      b.     SHELIA THOMAS regularly and systematically edited entries made by GUAS and GUES staff members in the ERC 1 record-keeping system without the knowledge or permission of the staff members who originally made the entries. Among other things, these edited entries falsely reflected time that GUAS and GUES clients spent receiving services for which those entities billed VMAP.

23.     During the scheme, EUGENE THOMAS, JR., BUFFINGTON, and SHELIA THOMAS caused the submission of at least $1,515,421 in fraudulent claims on behalf of GUES.

24.     On or about the following dates, for the purpose of executing and attempting to execute the scheme and artifice to defraud, the defendants set forth below, aided, abetted, counseled, induced, and encouraged by each other, and by others known to the Grand Jury, knowingly submitted and caused the submissions of false claims to VMAP:

8

| Count | Date | Defendant(s) | Claim(s) Description |
|---|---|---|---|
| 2 | 11/12/2018 | E. THOMAS, JR. | False claims totaling $8,164.96 for GUES supported employment services rendered to GUES clients between 11/5/2018 through 11/9/2018 at rate for 1 staff member per 2 clients, when in fact, services were rendered by 1 staff member per more than 4 clients. |
| 3 | 12/3/2018 | E. THOMAS, JR. | False claims billing for GUES supported employment services rendered to GUES clients A.N., D.W., and B.J. on 11/27/208 at rate for 1 staff member per 2 clients, when in fact, services were rendered by 1 staff member per more than 4 clients. |
| 4 | 12/24/2018 | E. THOMAS, JR. | False claim of $154 for 15 hours of GUES supported employment services rendered to GUES client K.H on 12/19/2018, when in fact, GUES rendered less than 8 hours of services. |
| 5 | 12/31/2018 | E. THOMAS, JR. S. THOMAS | False claims totaling $616 for GUES supported employment services rendered to GUES clients D.B., H.C., D.W., and A.N. on December 24, 2018, when in fact, no services were rendered on that date for those clients. |
| 6 | 1/8/2019 | E. THOMAS, JR. S. THOMAS | False claims totaling $712.25 for GUES supported employment services rendered to GUES clients D.B., H.C., D.W., and A.N. on January 1, 2019, when in fact, no services were rendered on that date for those clients. |
| 7 | 5/14/2019 | E. THOMAS, JR. | False claim of $154 for 8 hours of GUES supported employment services rendered to GUES client K.H on 5/6/2019, when in fact, GUES rendered less than 8 hours of services. |
| 8 | 2/23/2022 | E. THOMAS, JR. BUFFINGTON | False claim of $515.58 for 39 hours of GUAS day support supported services rendered to GUAS client DKB between February 14 and February 18, 2022, when in fact, GUAS provided less than 39 hours of services. |
| 9 | 5/9/2022 | E. THOMAS, JR. BUFFINGTON | False claim of $396.60 for 30 hours of GUAS day support supported services rendered to GUAS client DKB between May 2 and May 6, 2022, when in fact, GUAS provided less than 30 hours of services. |

(In violation of Title 18, United States Code, Sections 1347 & 2).

9

## COUNTS TEN THROUGH FIFTEEN
(False Statements Relating to Health Care Matters)

25.    The Grand Jury realleges and incorporates by reference paragraphs 1-24 of this Indictment as if fully set forth here.

26.    On or about the dates set forth below, in the Eastern District of Virginia, defendant SHELIA SIMMS THOMAS, aided, abetted, induced, counseled and encouraged by EUGENE THEODORE THOMAS, JR., knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, in connection with the delivery of and payment for health care benefits, items, and services, and in a matter involving a health care benefit program, in that SHELIA SIMMS THOMAS made edits to patient notes in the Electronic Record Company 1 digital record-keeping system which resulted in the following false representations:

| Count | Date | False Statement |
|-------|------|-----------------|
| 10 | 12/31/2018 | False representation that GUES client A.N. had been under visual supervision and interacted with GUES staff on December 24, 2018. |
| 11 | 12/31/2018 | False representation that GUES client D.B. had received partial physical support and interacted with GUES staff on December 24, 2018. |
| 12 | 12/31/2018 | False representation that GUES client D.W. had received partial physical support and interacted with GUES staff on December 24, 2018. |
| 13 | 12/31/2018 | False representation that GUES client H.C. had under been visual supervision and interacted with GUES staff on December 24, 2018. |
| 14 | 1/2/2019 | False representation that GUES client D.W. was monitored and had interacted with GUES staff on January 1, 2019. |
| 15 | 1/2/2019 | False representation that GUES client H.C. had interacted with GUES staff on January 1, 2019. |

(In violation of Title 18, United States Code, Sections 1035(a)(2) & 2.)

10

## COUNT SIXTEEN
(Conversion of Social Security Funds as Representative Payee)

27.     The Grand Jury realleges and incorporates by reference paragraphs 1-19 of this Indictment as if fully set forth here.

### Social Security Benefits

28.     The Social Security Administration (hereafter "SSA") is an independent agency of the United States federal government responsible for administering Social Security, a social insurance program consisting of retirement, disability, and survivor benefits. These Social Security benefits are paid from federally funded Social Security trust fund accounts in the United States Treasury.

29.     SSA disburses disability benefits by wire transfer and direct deposits to beneficiaries' designated bank accounts.

30.     If a beneficiary is legally incapable of managing their own funds, SSA will appoint a representative payee to receive and use those funds for the beneficiary's immediate care. Individuals and organizations can serve as representative payees, so long as they are deemed capable of ensuring that Social Security benefits are used for the immediate care of the beneficiary.

31.     To become a representative payee, an individual must complete a representative payee application. The individual is also required to agree that he or she will follow all SSA procedures to ensure that the individual will act in the best interest of the beneficiary.

32.     SSA requires all representative payees to use Social Security benefits to create a stable living environment for the beneficiary by providing for the beneficiary's current needs,

11

including food, clothing, housing, medical care, personal comfort items, and other reasonably foreseeable needs. SSA further requires that, once a beneficiary's current needs are met, their representative payee either conserve and save any remaining Social Security benefits for the beneficiary's future needs or invest those funds on the beneficiary's behalf.

33.     Representative payees are prohibited from using Social Security benefits for anything other than the beneficiary's needs.

34.     Representative payees are required to keep records and receipts of the beneficiary's expenses and to obtain SSA approval before using benefits to pay for other out-of-pocket expenses. A representative payee may transfer benefit funds from the account designated to receive those funds to another account for approved payment of reasonable, actual expenses. Representative payees are required to maintain documentation related to those transfers, as with any reimbursement, and to provide that documentation and explanation to SSA employees when requested.

35.     In addition to this record-keeping requirement, representative payees are required to complete annual reports for each beneficiary in which the representative payee certifies how the benefit payments were used, how much was saved, as well as any changes pertaining to the beneficiary. In addition, the representative payee is required to report to SSA if a beneficiary is deceased, no longer in the representative payee's care or custody, hospitalized for more than thirty (30) calendar days, or incarcerated. Likewise, the representative payee is required to report to SSA if unable to continue serving as a payee for any reason. These representative payee reports (RPRs) are made under penalty of perjury and with the acknowledgment that making a materially false or misleading statement on an RPR is a crime.

12

36.     At least 24 GUAS group home clients received disability payments from SSA. EUGENE THOMAS, JR. had applied with the SSA to act as representative payee for those clients, and the SSA appointed him as representative payee. The disability payment checks were deposited into individual representative payee accounts opened for each client.

37.     As a representative payee, EUGENE THOMAS, JR., had all the duties described in paragraphs 28-35 with respect to the Social Security funds entrusted to him. Rather than expend those funds for expenses related to the clients' personal needs, EUGENE THOMAS, JR. converted those funds to his own use and applied them to various business and personal expenses completely unrelated to the client's needs.

38.     From on or about January 2016 through on or about April 2020, the exact dates being unknown to the Grand Jury, EUGENE THEODORE THOMAS, JR. having made application to receive SSA disability payments for the use and benefit of at least 24 GUAS group home clients, and having received such payments, knowingly and willfully converted such payments or parts thereof, to uses other than for the use and benefit of those 24 GUAS clients.

(In violation of Title 42, United States Code, Section 408(a)(5).)

## COUNTS SEVENTEEN THROUGH TWENTY-ONE
(False Material Statements)

39.     The Grand Jury realleges and incorporates by reference paragraphs 1-19 and 28-38 of this Indictment as if fully set forth here.

40.     On or about the dates set forth below, in the Eastern District of Virginia, defendant EUGENE THEODORE THOMAS, JR. knowingly made materially false, fictitious, and fraudulent statements and representations to the Social Security Administration, an agency within the jurisdiction of the Executive Branch of the Government of the United States, in

13

Representative Payee Reports (RPR) submitted to the SSA with respect to the disposition of SSA

disability payment funds for the GUAS group home clients listed below:

| Count | Date | False Statement |
|-------|------|-----------------|
| 17 | 7/18/2019 | RPR falsely representing that between July 1, 2018, and June 30, 2019, EUGENE THOMAS, JR. had spent $4,632 in SSA disability benefits entrusted to him on behalf of J.A. on clothing, education, medical and dental expenses, recreation, or personal items for J.A. |
| 18 | 7/26/2019 | RPR falsely representing that between July 1, 2018, and June 30, 2019, EUGENE THOMAS, JR. had spent $2,366 in SSA disability benefits entrusted to him on behalf of J.R. on clothing, education, medical and dental expenses, recreation, or personal items for J.R. |
| 19 | 9/16/2019 | RPR falsely representing that between September 1, 2018, and August 31, 2019, EUGENE THOMAS, JR. had spent $2,368 in SSA disability benefits entrusted to him on behalf of D.B. on clothing, education, medical and dental expenses, recreation, or personal items for D.B. |
| 20 | 3/27/2020 | RPR falsely representing that between March 1, 2019, and February 29, 2020, EUGENE THOMAS, JR. had spent $1,144 in SSA disability benefits entrusted to him on behalf of D.W. on clothing, education, medical and dental expenses, recreation, or personal items for D.W. |
| 21 | 4/13/2020 | RPR falsely representing that between April 1, 2019, and March 31, 2020, EUGENE THOMAS, JR. had spent $2,368 in SSA disability benefits entrusted to him on behalf of E.E. on clothing, education, medical and dental expenses, recreation, or personal items for E.E. |

(In violation of Title 18, United States Code, Section 1001(a)(2).)

## COUNTS TWENTY-TWO THROUGH TWENTY-FOUR
### (Wire Fraud)

### The Small Business Administration

41.     The United States Small Business Administration ("SBA") is an Executive

Branch agency of the United States Government that provides support to entrepreneurs and small

businesses. The mission of the SBA is to maintain and strengthen the nation's economy by

enabling the establishment and viability of small businesses and by assisting in the economic

14

recovery of communities after disaster.

42.     As part of this effort, the SBA enables and provides for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

### The Paycheck Protection Program

43.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans suffering the economic consequences of the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for the expansion of other programs to address the COVID-19 pandemic.

44.     One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other business expenses, through a program referred to as the Paycheck Protection Program ("PPP").

45.     To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business, to a financial institution. The PPP loan applicant was required to acknowledge the Program rules and to make certain affirmative certifications to be eligible to obtain the PPP loan. The PPP loan application required the applicant to state, among other things, the: (a) business's average monthly payroll expenses, and (b) the number of employees employed by the business. These figures were used to determine whether the business was eligible for a PPP loan and if so, the amount of funds the business could receive under the Program. Businesses applying for a PPP loan were also required to provide documentation of their business's payroll expenses.

46.     A PPP loan application had to be processed by a participating financial institution

15

(the lender). If the PPP loan application was approved, the lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Lenders required that the information in the PPP loan applications be truthful, including the applicant's representations regarding the applicant's employees and payroll expenses. Such representations were material to the lender's decisions on both PPP loan approval and the loan funding amount.

47.     The lender transmitted data from the application, including information about the borrower, the total amount of the loan, and the listed number of the business's employees, to the SBA while processing the loan.

48.     PPP loan proceeds could only be used by the applicant business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.

## The Scheme and Artifice to Defraud

49.     The Grand Jury realleges and incorporates by reference paragraphs 10-16 of this Indictment as if fully set forth here.

50.     From on or about at least April 8, 2020, through at least on or about August 31, 2021, in the Eastern District of Virginia and elsewhere, defendant EUGENE THOMAS, JR., devised and intended to devise a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises.

## Purpose of the Scheme and Artifice

51.     The purpose of the scheme and artifice was for defendant EUGENE THOMAS, JR. to fraudulently obtain disaster-related benefits in the form of SBA PPP loans.

## Manners and Means of the Scheme and Artifice

52.     The scheme and artifice employed the following manners and means, among

16

others:

    a.  Defendant EUGENE THOMAS, JR. submitted and caused the submission of applications for PPP loans that contained knowingly and deliberately false statements, misrepresentations, and omissions related to his intended uses of the PPP loan proceeds.

    b.  Defendant EUGENE THOMAS, JR. had PPP loan proceeds paid to both family members who acted as "straw employees" of GUAS and GUES, as well as actual employees of GUAS and GUES. Acting at EUGENE THOMAS JR.'s direction, both the "straw" and actual employees of GUAS and GUES returned the PPP loan funds to EUGENE THOMAS, JR. almost immediately after they were paid.

    c.  Defendant EUGENE THOMAS, JR. misused the PPP loan proceeds and did not apply them toward their authorized purposes.

    d.  Defendant EUGENE THOMAS, JR. made or caused the making of false representations about his use of the PPP loan proceeds to obtain forgiveness of approximately $289,300 in PPP loan proceeds.

53.    It was further a part of the scheme and artifice that the defendant caused the transmission of information and funds by wire between locations within the Eastern District of Virginia and locations outside of the Commonwealth of Virginia.

## GUAS PPP Loan

54.    On or about April 3, 2020, EUGENE THOMAS, JR. applied for a PPP loan for GUAS through Village Bank. EUGENE THOMAS, JR. requested $254,300 in loan proceeds, stating that the loan would be used for GUAS's payroll expenses, GUAS lease or mortgage

interest, or utilities. EUGENE THOMAS, JR. also certified on the loan application itself and a
separate accompanying certification that:

    a. "Current economic uncertainty makes this loan request necessary to support the
       ongoing operations of the Applicant."

    b. The loan proceeds would "be used to retain workers and maintain payroll or make
       mortgage interest payments, lease payments, and utility payments."

    c. "[I]f the [loan proceeds] are knowingly used for unauthorized purposes, the federal
       government may hold me legally liable, such as for charges of fraud."

    d. Loan forgiveness, if sought, would be "provided for the sum of documented payroll
       costs, covered mortgage interest payments, covered rent payments, and covered
       utilities, and not more than 25% of the forgiven amount may be for non-payroll
       costs."

    e. The information provided in the application was "true and accurate in all material
       respects" and making knowingly false statements on the application violated various
       provisions of federal law.

    55.     In Spring 2020, EUGENE THOMAS, JR. induced various family members to
submit employment applications to GUAS under the pretense that the family members might be
needed to replace or supplement GUAS employees during the pandemic.

    56.     On or about April 16, 2020, EUGENE THOMAS, JR. signed a Promissory Note
to Village Bank in the amount of $254,300 for the GUAS PPP loan.

    57.     Village Bank approved EUGENE THOMAS, JR.'s loan application for the
GUAS PPP loan, and on April 22, 2020, provided GUAS with $254,300 in PPP loan funds,

depositing those loan proceeds into GUAS's Village Bank account number xxxxxx2579. On May 6, 2020, EUGENE THOMAS, JR. obtained a cashier's check in the amount of $254,295 drawn on account number xxxxxx2579 and deposited that check into GUAS Atlantic Union Bank account xxxxxx8039.

58.    EUGENE THOMAS, JR. did not apply the GUAS PPP loan funds to authorized expenses. Rather, during May 2020, he paid most of these funds out to the family members he had procured as "straw employees." Shortly after these PPP loan funds were deposited into the straw employees' bank accounts, EUGENE THOMAS, JR. requested that the straw employees return the funds to him, claiming that they had been paid by mistake. The straw employees then returned to those PPP loan proceeds funds to EUGENE THOMAS, JR., who deposited them into his personal bank account and subsequently applied them toward various non-authorized expenses.

59.    EUGENE THOMAS, JR. also paid out GUAS PPP loan proceeds to his parents. EUGENE THOMAS, JR. had access to his parents' bank account and advised his parents not to spend the PPP loan funds that had been deposited in that account. Shortly thereafter, EUGENE THOMAS, JR. transferred the GUAS PPP loan proceeds from his parents' bank account to his personal account. He did not apply the funds to any authorized purpose.

### GUES PPP Loan

60.    On or about April 3, 2020, EUGENE THOMAS, JR. applied for a PPP loan for GUES through Village Bank. EUGENE THOMAS, JR. requested $35,000 in loan proceeds, stating that the loan would be used for GUES's payroll expenses, lease payments or mortgage interest, or utilities. On this loan application, EUGENE THOMAS, JR. made the same

certifications described in paragraph 54.

61.     On or about April 16, 2020, EUGENE THOMAS, JR. signed a Promissory Note to Village Bank in the amount of $35,000 for the PPP loan to GUES.

62.     On or about April 22, 2020, Village Bank approved EUGENE THOMAS JR.'s loan application on behalf of GUES, and provided GUES with $35,000 in PPP loan funds, depositing those loan proceeds into GUES Village Bank account number xxxxxx2574. On May 6, 2020, EUGENE THOMAS, JR. received a cashier's check drawn on account number xxxxxx2574 in the amount of $34,995 and deposited that check into GUES Atlantic Union Bank number xxxxxx1648. The funds were ultimately disbursed as set forth below via the payroll company that GUES used.

63.     EUGENE THOMAS, JR. paid out GUES PPP loan proceeds to his parents, neither of whom was then employed with GUES. EUGENE THOMAS, JR. had access to his parents' bank account and advised his parents not to spend the PPP loan funds that had been deposited in that account. Shortly thereafter, EUGENE THOMAS, JR. transferred the GUES PPP loan proceeds from his parents' bank account to his personal account and applied them to personal expenses.

64.     EUGENE THOMAS, JR. also made two payments of GUES loan proceeds to Employee 1, who was not employed by GUES. EUGENE THOMAS, JR. made these payments to Employee 1 in addition to Employee 1's earned pay from GUAS, where Employee 1 was employed. Acting on instructions from EUGENE THOMAS, JR., Employee 1 then withdrew those funds from her bank account in cash and gave them to EUGENE THOMAS, JR. More specifically:

20

    a.   On May 20, 2020, Employee 1 received a transfer in the amount of $1,053.59 from GUES's payroll company.

    b.   On May 20, 2020, Employee 1 withdrew the sum of $1,053.59 in cash and provided that cash to EUGENE THOMAS, JR.

    c.   On May 28, 2020, Employee 1 received a transfer in the amount of $1,053.59.

    d.   On May 29, 2020, Employee 1 withdrew the sum of $1,053.59 in cash and provided that cash to EUGENE THOMAS, JR.

65.     In or around May 2020, EUGENE THOMAS, JR., with the assistance of Employee 1, caused the creation of documents falsely representing that PPP loan funds had been paid to GUES clients in cash as "hazard pay," when in fact, EUGENE THOMAS, JR. had retained those PPP loan funds himself.

### PPP Loan Forgiveness Applications

66.     On or about January 17, 2021, EUGENE THOMAS, JR. applied to the SBA for forgiveness of the GUES PPP Loan. In this application, EUGENE THOMAS, JR. falsely claimed that GUES had expended the PPP loan proceeds on payroll costs. Acting on this information, the SBA forgave repayment of the GUES PPP Loan.

67.     On August 17, 2021, Accountant #1, acting on false information knowingly provided to him by EUGENE THOMAS, JR., applied to the SBA for forgiveness of the GUAS PPP Loan. The false information provided to the SBA included false claims that GUAS had expended the PPP loan proceeds on payroll costs. Acting on this information, the SBA forgave repayment of the GUAS PPP Loan.

## Execution of the Scheme and Artifice

68.     On or about the dates set forth below, in the Eastern District of Virginia and

elsewhere, for the purposes of executing and attempting to execute the above-described scheme

and artifice to defraud and for obtaining money and property by means of materially false and

fraudulent pretenses, representations, and promises, defendant EUGENE THEODORE

THOMAS, JR. knowingly caused to be transmitted by means of wire communication in

interstate commerce, the writings, signs, signals, pictures, and sounds described below:

| Count | Date | Description of Wire Transmission |
|-------|------|--------------------------------|
| 22 | 5/28/2020 | ACH payment of $35,103.51 in PPP loan proceeds from GUAS Atlantic Union Bank account xxxxxx8021 in the Eastern District of Virginia through a Federal Reserve Bank facility outside the Commonwealth of Virginia to a payroll company used by GUAS. |
| 23 | 5/28/2020 | ACH payment of $14,656.62 in PPP loan proceeds from GUES Atlantic Union Bank account xxxxxx1648 in the Eastern District of Virginia through a Federal Reserve Bank facility outside the Commonwealth of Virginia to a payroll company used by GUES. |
| 24 | 8/17/2021 | Loan forgiveness application for GUAS PPP loan filed in Richmond, Virginia and routed through a Comcast server in Mt. Carmel, New Jersey. |

(In violation of Title 18, United States Code, Section 1343.)

## COUNT TWENTY-FIVE
(Obstruction of Official Proceedings—Inducing Accountant 1 to Author Letter Containing False Statements about Representative Payee Accounts)

69.     The Grand Jury realleges and incorporates by reference paragraphs 10-16 of this

Indictment as if fully set forth here.

70.     As of Spring 2022, the grand jury investigation that led to this Indictment was pending, and the scope of that investigation included the allegations regarding the embezzlement of Social Security representative payee funds set forth in Count 16.

71.     In or around March 2022, in the Eastern District of Virginia and within the jurisdiction of the Court, defendant EUGENE THEODORE THOMAS, JR., did unlawfully and corruptly attempt to obstruct and influence an official proceeding, that is, proceedings before United States Grand Jury 22-1 in the United States District Court for the Eastern District of Virginia.

72.     As part of the foregoing scheme to corruptly obstruct and impede, and to attempt to obstruct and impede the official proceedings referenced previously:

     a.  In or around March 2022, EUGENE THOMAS, JR. approached Accountant 1 and advised Accountant 1 that a government investigation was pending as to the way EUGENE THOMAS, JR. and GUAS had handled Social Security Social Security disability funds entrusted to EUGENE THOMAS, JR. as a representative payee.

     b.  In or around March 2022, EUGENE THOMAS, JR. induced Accountant 1 to write a letter on the letterhead of Accounting Firm 1 regarding the representative payee accounts at issue in this case. The accountant was aware that this letter would be presented to Law Firm A and Attorney A, as well as to individuals involved with the government's investigation into EUGENE THOMAS, JR.'s handling of representative payee funds.

     c.  Thereafter, Accountant 1 authored a letter dated March 23, 2022, on Accounting Firm 1's letterhead. The letter bore EUGENE THOMAS, JR.'s name and home address

and contained the salutation "Dear Sir or Madam." The letter began by relating the

general accounting services Accounting Firm 1 provided for EUGENE THOMAS, JR.

and GUAS, which included preparation of tax returns. The letter further stated in part as

follows:

> Even more specifically, Greater Unity manages representative payee accounts for
> individuals who are clients of the Company. **Over the years, we have advised and
> implemented certain best practices related to the accounting for these accounts,
> and we have helped to ensure all fund transfers to and from the business have
> been properly recorded in QuickBooks.** These transactions include periodic
> transfers of funds to the business and from the business' operating bank account to a
> personal bank account of Mr. Thomas. These fund transfers related to the
> representative payee accounts occurred for convenience purposes to help logistically
> with both advancements of and reimbursements for business expenses paid by
> Greater Unity on behalf of these representative payee clients. We are fully
> comfortable the funds managed by Greater Unity on behalf of its representative
> payee clients have been used for the benefit of the individual representative payee
> clients.
>
> Several years ago, mainly due to staffing limitations, Mr. Thomas helped to manage
> the accounting related to these accounts, **while we assisted to ensure all
> transactions were recorded properly in QuickBooks. Throughout our
> involvement with Greater Unity's accounting, we have been comfortable with
> the methodology used to record in QuickBooks the periodic advancements and
> reimbursements paid to Mr. Thomas through fund transfers between the
> company and himself, as the representative payee funds have been used for the
> benefit of the individuals.** A subledger showing transaction-level detail by
> representative payee clients for these types of fund transfer transactions and
> reimbursements was kept, while the transfers and reimbursements were being
> properly recorded in QuickBooks. Eventually, as staffing limitations eased, a more
> robust step for tracking these reimbursements was implemented in order to more
> easily view in QuickBooks the additional transaction-level detail related to these
> types of transactions involving representative payee accounts. Although this more
> robust bookkeeping step required more time to complete, **it was an accounting
> process improvement we recommended implementing** because the benefits of
> having an additional level of accounting detail for the representative payee accounts
> outweighed the additional time and effort required to implement this enhancement.

d. The bolded representations above were false, because Accounting Firm 1 had

rendered no services or advice whatsoever with respect to the representative payee

accounts at issue in this case and had no access to those accounts. Furthermore, the

24

remaining non-bolded representations above were misleading, in that the non-bolded representations were based completely on uncorroborated information EUGENE THOMAS, JR. provided to Accountant 1, which Accountant 1 then parroted in the letter without conducting any due diligence as to whether it was true. Accountant 1 had no personal knowledge regarding the representative payee accounts. In fact, neither Accountant 1 nor any other employee or partner of Accounting Firm 1 had seen the ledgers and records discussed in those non-bolded representations. The letter's twice-expressed "comfort" with EUGENE THOMAS, JR.'s use of representative payee funds was based completely on information provided by EUGENE THOMAS, JR., and—contrary to the letter's implication—was not the product of any accountant's application of professional judgment following review of the documents in question.

e. Acting on EUGENE THOMAS JR.'s behalf, Attorney A presented Accountant 1's March 23, 2022 letter containing the false representations to the government in an attempt to convince the government that EUGENE THOMAS, JR.'s misuse of representative payee funds was the product of sloppy accounting rather than an act of fraud.

(In violation of Title 18, United States Code, Section 1512(c)(2).)

## COUNT TWENTY-SIX
(Obstruction of Official Proceedings—Tampering with Grand Jury Witness Employee 1)

73.     Law enforcement agents interviewed Employee 1 in connection with the investigation on March 22, 2021, and again on March 20, 2023, at the offices of Law Firm B and in the presence of Attorney B. During the March 20, 2023 interview, Employee 1 was asked

25

about the documents referenced in paragraph 65. Employee 1 related that those letters falsely asserted that the GUES clients named in the letters had received cash payments of wages owed.

74. Employee 1 was subsequently served with a subpoena to testify before Grand Jury 22-1, which was sitting in the Richmond Division of the United States District Court for the Eastern District of Virginia, on May 3, 2023.

75. Between March 20 and May 3, 2023, in the Eastern District of Virginia and within the jurisdiction of the Court, defendant EUGENE THEODORE THOMAS, JR., did unlawfully and corruptly attempt to persuade a person (that is, Employee 1) with the intent to influence Employee 1's testimony in an official proceeding, that is, proceedings before United States Grand Jury 22-1 in the United States District Court for the Eastern District of Virginia.

76. As part of the foregoing scheme to corruptly obstruct and impede, and attempt to obstruct and impede, the official proceedings referenced previously:

a. EUGENE THOMAS, JR. approached Employee 1 on several occasions and suggested that Employee 1 falsely testify before Grand Jury 22-1 that GUES clients had been paid cash wages during May 2020, when in fact, as both EUGENE THOMAS, JR. and Employee 1 well knew, the GUES clients had not been paid such wages. EUGENE THOMAS, JR. also told Employee 1 that he was attempting to make arrangements for Employee 1 not to have to testify before Grand Jury 22-1.

b. On or about April 13, 2023, EUGENE THOMAS, JR., without explanation, overpaid Employee 1 by $2,500 above Employee 1's usual GUAS wages.

c. On or about April 24, 2023, Employee 1 delivered a cashier's check in the amount of $2,500 to EUGENE THOMAS, JR. to return the overpayment to him, as

26

Employee 1 was not comfortable accepting those funds from EUGENE THOMAS, JR.

When EUGENE THOMAS, JR. took these funds from Employee 1, he asked Employee 1

about Employee 1's feelings on Employee's 1 upcoming grand jury testimony.

(In violation of Title 18, United States Code, Section 1512(b)(1).)

### COUNT TWENTY-SEVEN
(Conspiracy to Obstruct Official Proceedings)

77.     Beginning on at least March 7, 2023 and continuing through at least April 18,

2023, in the Eastern District of Virginia and within the jurisdiction of the Court, defendants

EUGENE THEODORE THOMAS, JR. and BRADY ANDREW BUFFINGTON did unlawfully

and knowingly conspire to corruptly obstruct and impede, and attempt to obstruct and impede,

official proceedings in the United States District Court for the Eastern District of Virginia, that

is, proceedings before Grand Jury 22-1, in violation of Title 18, United States Code, Section

1512(c)(2).

(In violation of Title 18, United States Code, Section 1512(k).)

### COUNT TWENTY-EIGHT
(Obstruction of Official Proceedings—Fabrication of Scheduling Records Maintained by
Software Company 1)

78.     As of Spring 2023, the grand jury investigation that led to this Indictment

remained pending, and the scope of that investigation included, but was not limited to, the

conduct giving rise to the violations of 18 U.S.C. §§ 1349 (Conspiracy to Commit Health Care

Fraud), 1347 (Health Care Fraud), and 1035 (False Statements Relating to Health Care Matters)

set forth in Counts 1-15. The scope of the grand jury investigation included the hours GUES

clients worked and whether they were paid for their work.

79. On or about March 7, 2023, a federal law enforcement agent served a subpoena on GUAS and GUES though Attorney A. The subpoena required the production of certain records and testimony from a records custodian on May 2, 2023, before Grand Jury 22-1, sitting in the United States District Court for the Eastern District of Virginia, Richmond Division.

80. Beginning as early as March 7, 2023 and continuing through at least April 18, 2023, in the Eastern District of Virginia and within the jurisdiction of the Court, defendants EUGENE THEODORE THOMAS, JR. and BRADY ANDREW BUFFINGTON, aided, abetted, induced, counseled, and encouraged by each other, did unlawfully and corruptly attempt to obstruct and influence an official proceeding, that is, proceedings before Grand Jury 22-1 in the United States District Court for the Eastern District of Virginia.

81. As part of the foregoing scheme to corruptly obstruct and impede, and attempt to obstruct and impede, the official proceedings referenced previously:

a. In or around March 2023, EUGENE THOMAS, JR. requested that Employee 1 provide him with the log-in information and the password Employee 1 used to access a time, attendance, and scheduling (TAS) program that GUAS maintained with Software Company 1. EUGENE THOMAS, JR. told Employee 1 at that time that GUAS was going to transition to a different TAS system.

b. On March 20, 2023, BUFFINGTON was interviewed by law enforcement agents at the offices of Law Firm B and in the presence of Attorney B, who had been representing him. Among the topics discussed during that interview was the question of why, or whether, certain GUES clients had paid for only one hour of work per day, when in fact, those GUES clients had worked for more than one hour. GUES client D.W. was

28

specifically identified, by name, as one such GUES client during this interview.

      c.      Between March 28 and April 18, 2023, BUFFINGTON used a GUES TAS administrator account to create over 32,000 schedules for GUES clients reflecting shifts worked between 2015 and 2022. This GUES TAS account had been created without the knowledge or consent of Employee 1, whose email address and cell phone number were associated with the account. Employee 1 did not know of or access this GUES TAS account. Using this TAS account, BUFFINGTON created thousands of schedules at one time. These mass-created schedules consistently reflected shifts of two hours or more worked by GUES clients. Among the GUES clients for whom these shifts were created was GUES client D.W.

      d.      On June 6, 2023, BUFFINGTON, accompanied by Attorney B, volunteered additional information to the agents who had spoken with BUFFINGTON on March 20, 2023. BUFFINGTON related that he had accessed the GUES TAS system supported by Software Company 1 following the March 20, 2023 interview, and that he had been surprised to discover that there were GUES clients who had been mistakenly paid for only one hour of work at various times when those clients should have been paid for two hours. BUFFINGTON claimed that this was caused by errors that occurred when the TAS information was uploaded and sent to the company that handled GUES's payroll. BUFFINGTON also said that arrangements were being made to compensate the underpaid clients.

(In violation of Title 18, United States Code, Sections 1512(c)(2) & 2.)

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) FED. R. CRIM. P., the defendants are notified that:

A.      If convicted of any of the offenses alleged in Counts 1-9 or 22-24, they shall forfeit to the United States any property, real or personal, constituting, or derived from, proceeds traceable to such violations;

B.      Property subject to forfeiture includes, but is not limited to, a sum of money of at least $1,803,721, representing the proceeds of the offenses charged, which shall be reduced to a money judgment against the defendant in favor of the United States; and

C.      If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p).)

A TRUE BILL:


FOREPERSON


JESSICA D. ABER
UNITED STATES ATTORNEY

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

By: _____
Michael C. Moore
Assistant United States Attorney